BERNICE ACKERMAN, APPELLANT, V. METROPOLITAN COMMUNITY COLLEGE AREA, DOING BUSINESS AS METROPOLITAN COMMUNITY COLLEGE, A POLITICAL SUBDIVISION OF THE STATE OF NEBRASKA, AND THE BOARD OF GOVERNORS OF METROPOLITAN COMMUNITY COLLEGE AREA, APPELLEES.
SHARON TRUSSELL, APPELLANT, V. METROPOLITAN COMMUNITY COLLEGE AREA, A POLITICAL SUBDIVISION OF THE STATE OF NEBRASKA, AND THE BOARD OF GOVERNORS OF METROPOLITAN COMMUNITY COLLEGE AREA, APPELLEES.
TAMMIE R. PHILLIPS, APPELLANT, V. METROPOLITAN COMMUNITY COLLEGE AREA, A POLITICAL SUBDIVISION OF THE STATE OF NEBRASKA, AND THE BOARD OF GOVERNORS OF METROPOLITAN COMMUNITY COLLEGE AREA, APPELLEES.

575 N.W. 2d 181

Filed February 24, 1998.    Nos. A-96-1010, A-96-1061, A-96-1062.

M.H. Weinberg, of Weinberg & Weinberg, P.C., for appellant Ackerman.

Mark D. McGuire, of McGuire and Norby, for appellants Trussell and Phillips.

Robert T. Cannella, of Fitzgerald, Schorr, Barmettler & Brennan, P.C., for appellees.

MILLER-LERMAN, Chief Judge, and IRWIN and SIEVERS, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Bernice Ackerman, Sharon Trussell, and Tammie R. Phillips (referred to herein collectively as "the plaintiffs") each filed a petition in error in the district court for Douglas County to obtain review of orders of the board of governors of Metropolitan Community College Area (Board) terminating their employment as a result of a reduction in force. Following the district court's affirmance of the orders of the Board, the plaintiffs timely appealed to this court.

In the hearing before the Board, the proposed terminations of employment of the plaintiffs were heard together. Pursuant to a stipulation of all parties, the error proceedings were consolidated in the district court. On appeal, each plaintiff docketed her appeal separately. However, Trussell and Phillips filed their briefs jointly. We note that each case involves the same general factual background and that many of the errors assigned in the Trussell and Phillips brief are also assigned in the Ackerman

brief. In order to prevent duplicitive opinions, we consider together the assigned errors of the plaintiffs and refer to these appeals as the instant "case."

## II. BACKGROUND

The plaintiffs had been employed with Metropolitan Community College (College) as teachers in the office skills and technology (OST) program for 13 years or more. In letters dated December 14, 1995, nine OST faculty members, including the plaintiffs, were individually informed that due to declining student enrollment in the OST program, the interim vice president of educational affairs was recommending to the College president that the OST program be reorganized and that the reorganization could result in a reduction in force from nine full-time faculty to six full-time faculty.

In a resolution dated December 19, 1995, the Board decided to reduce the full-time faculty for the OST program from nine to six, to be effective at the end of the spring quarter of the 1995-96 academic year. The Board requested that the president present recommendations at the January Board meeting regarding which faculty contracts should not be renewed as a result of the reduction in force. This presentation was to be in accordance with the Board's reduction in force policy as set forth in a procedures memorandum entitled "Implementation Process Pertaining to Reduction in Force Policy for Full-Time Employees Covered in Negotiated Statement of Policy" (RIF policy).

The RIF policy outlines the procedure to be followed when a reduction in force is required. The RIF policy was adopted pursuant to Neb. Rev. Stat. § 85-1530 (Reissue 1994). Generally, the results from the two most recent faculty evaluations for each of the relevant staff in the area affected by the reduction in force are tallied to find the midpoint for the evaluated staff. Each staff member whose evaluation result is below the midpoint is a candidate for the reduction in force. Each staff member below the midpoint is then given a score in the categories of level of placement, diversity, and length of service. The staff members receiving the lowest points are those recommended to be discharged for reduction in force purposes. The relevant sections

of the policy and statutes will be set forth and discussed in the analysis below.

In the present case, the division chair, the interim vice president of educational affairs, and the director of human resources applied the reduction in force provisions of the RIF policy to the OST faculty. Linda Wild, the division chair, compiled the results of the 1993-94 and 1994-95 evaluations of the OST faculty to determine a midpoint. The four OST faculty members below the midpoint were the three plaintiffs and Lana Flaming. Each of the four was next given a score based on level of placement, diversity, and length of full-time service. Because the plaintiffs were the three teachers with the lowest scores, it was recommended to the Board that the plaintiffs be the three OST faculty discharged due to the reduction in force.

By hand-delivered letters dated February 7, 1996, the plaintiffs were notified by the Board that the president had recommended that their contracts not be renewed for the 1996-97 academic year due to the reduction in force. The letter informed them that they had 5 days within which to request a hearing of the Board. Each of the plaintiffs requested such a hearing. The hearing was held February 20 and continued into the early morning hours of February 21. The College and the plaintiffs presented evidence. At the conclusion of the hearing, the Board adopted resolutions ordering the reduction in force of the plaintiffs at the expiration of their employment contracts on May 24.

Each plaintiff subsequently filed a petition in error in the district court for Douglas County. The district court affirmed the Board's decision, finding that the Board had acted within its jurisdiction, that there was "sufficient evidence" before the Board to uphold the discharge of the plaintiffs, and that the plaintiffs had not been denied due process. These appeals timely followed.

### III. ASSIGNMENTS OF ERROR

In her brief, Ackerman assigns 12 errors, which we have consolidated for discussion to the following 7 errors: Ackerman asserts that the RIF policy should have applied to part-time employees as well as full-time employees and that the policy should have included copies of the relevant evaluation forms

used in assessing which teachers would be terminated. Ackerman also alleges that the Board failed to comply with the RIF policy's provisions concerning the timing of her hearing. Ackerman further alleges that the Board failed to consider the proper evaluations in assessing the determination to terminate her employment, that the various teachers considered for termination were not scored properly under the RIF policy, and that there was no causal connection between the change of circumstances necessitating a reduction in force and her personally. Finally, Ackerman asserts that she was denied due process during the hearing before the Board and that the Board improperly received an exhibit into evidence.

In their brief, Trussell and Phillips assign five errors. They assert that the RIF policy should have been applied to part-time employees and that the policy is required to contain copies of the evaluations used in the reduction in force process. They also assert that the Board erred in not using the proper evaluations according to the RIF policy. Finally, they assert that they were denied due process and that the Board erred in improperly receiving an exhibit into evidence.

## IV. ANALYSIS

### 1. STANDARD OF REVIEW

The standard of review in a proceeding in error from an order of a school board terminating the contract of a tenured teacher is whether the school board acted within its jurisdiction and whether there is sufficient evidence as a matter of law to support its decision. *Boss v. Fillmore Cty. Sch. Dist. No. 19*, 251 Neb. 669, 559 N.W.2d 448 (1997). The evidence is considered sufficient as a matter of law if the school board could reasonably find the facts as it did on the basis of the testimony and exhibits contained in the record before it. *Id.* Stated another way, the evidence is considered sufficient as a matter of law, or is " ' "substantial" ' " or constitutes " ' "some competent evidence," ' " as those terms have been used in prior articulations of the standard of review in these cases, "if a judge could not, were the trial to a jury, direct a verdict." *Id.* at 676, 559 N.W.2d at 453 (quoting *Eshom v. Board of Ed. of Sch. Dist. No. 54*, 219 Neb. 467, 364 N.W.2d 7 (1985)).

## 2. RIF POLICY'S COMPLIANCE WITH STATUTE

The plaintiffs have raised several issues on appeal which bring into question whether the policy is in compliance with Neb. Rev. Stat. § 85-1501 et seq. (Reissue 1994 & Cum. Supp. 1996). These issues include whether or not the statutes require the Board's RIF policy to apply to part-time employees as well as full-time employees, whether the statutes require the policy to include actual copies of any evaluations to be used in assessing which employments to terminate, and whether the policy's provisions concerning the appropriate timing of a hearing requested by an employee who has been given notice that his or her employment may be terminated comply with the statutes. Because our interpretation of the requirements of the statutory sections at issue is a question of law, we reach our conclusion in that respect independent of the trial court's decision. *Cox v. York Cty. Sch. Dist. No. 083*, 252 Neb. 12, 560 N.W.2d 138 (1997).

### (a) Application to Part-Time Employees

The plaintiffs have all asserted on appeal that the Board and the district court erred by not finding that the RIF policy must apply to part-time employees as well as full-time employees. There is no dispute by any of the parties that the RIF policy at issue applies only to full-time employees. The policy, entitled "Implementation Process Pertaining to Reduction in Force Policy for *Full-Time Employees* Covered in Negotiated Statement of Policy," begins with the phrase "[w]henever it becomes necessary to reduce the number of regular *full-time professional staff.*" (Emphasis supplied.) The question raised by the plaintiffs, then, is simply whether a policy pertaining only to full-time employees is permissible under § 85-1501 et seq., or whether it must include part-time employees as well.

We note that Nebraska is, generally, considered to be an at-will employment state. See *Hoschler v. Kozlik*, 3 Neb. App. 677, 529 N.W.2d 822 (1995) (in tortious interference with business relationship case, court infers at-will employment absent allegations of contract to alter at-will status). A person's at-will status may, however, be modified pursuant to statute or contractual obligations placed on the parties to the employment relationship. See *Blair v. Physicians Mut. Ins. Co.*, 242 Neb. 652, 496

N.W.2d 483 (1993) (exceptions to termination at will exist where constitutional, statutory, or contractual rights require termination for good cause only). In the present case, the plaintiffs were all employed pursuant to employment contracts with the College.

The relevant statutes for consideration of whether the RIF policy was required to be applicable to part-time employees as well as full-time employees are §§ 85-1528 through 85-1530, primarily § 85-1530. Section 85-1530 provides as follows:

> Each board shall adopt a reduction-in-force policy *covering employees subject to such statutory provisions* to carry out the intent of sections 85-1530 to 85-1533. No such policy shall allow the reduction of a *permanent or tenured employee* while a *probationary employee* is retained to render a service which such *permanent* employee is qualified by reason of certification and endorsement to perform . . . .

(Emphasis supplied.)

We note that the foregoing language does not appear to have been interpreted yet in this state and that the emphasized terms are not defined within the statutes. In construing a statute, we must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense. *Nickel v. Saline Cty. Sch. Dist. No. 163*, 251 Neb. 762, 559 N.W.2d 480 (1997). In so doing, we must look to the statute's purpose and give the statute a reasonable construction which best achieves that purpose, rather than a construction which would defeat it. *Id.*

Section 85-1530, which is the relevant statute directing a community college board to establish a RIF policy, makes no mention of part-time employees. Section 85-1530 speaks only in terms of permanent, tenured, and probationary employees. Additionally, when the statutes are all read together, it is apparent that § 85-1528, which dictates the notice which must be given to an employee before his or her employment may be terminated, is intended to apply to full-time employees. The statute speaks in terms of contracts "for the ensuing year," provides for automatic renewal of annual contracts, and requires

notice of impending termination of employment to be given to the employee at least 90 days prior to the close of a contract period of any ensuing reduction in force.

According to the record, part-time employees are hired by the College on a quarterly basis. There is nothing in the record to suggest that part-time employees enjoy the statutory advantages of having automatic contract renewals, and, indeed, because they are hired on a quarterly basis, if § 85-1528 is intended to apply to them, the Board would be required to provide notice of impending termination 90 days prior to the start of the quarter, which in many cases would be prior to actually hiring part-time employees. As such, there is nothing in the plain language of § 85-1528 which suggests that part-time employees are intended to be covered by the reduction in force provisions.

Testimony presented before the Board indicated that it is infeasible to operate a community college program without utilizing a certain number of part-time teachers because of the various scheduling considerations inherent in community college programs; that is, the College offers several sections of various courses at several campuses across the city, often at the same time as one another. Additionally, the College often utilizes part-time teachers in order to get more qualified individuals, who may have other full-time careers, to teach certain courses.

Finally, we note that the Legislature has in other areas provided statutory means for part-time employees to earn job protection enjoyed by full-time employees. For example, in Neb. Rev. Stat. § 79-825 (Reissue 1996), the Legislature provides the means for part-time certificated school teachers to be considered permanent certificated teachers for reduction in force considerations. No such section appears with respect to employees of the community colleges.

Reading the statutes together, it is apparent from the plain language of the statutes that the Legislature contemplated providing statutory protection to permanent, full-time community college employees when faced with a reduction in force situation. Nothing in the statutes speaks in terms of part-time employees, and the statutes do not appear to intend such inclusion. As such, the plaintiffs' allegations that the RIF policy should apply to part-time employees as well is without merit.

We note that Ackerman specifically assigned various errors concerning the RIF policy and its reassignment provisions, which provide for reassignment only to other available full-time employment and provide for reassignment of part-time employees within the same teaching discipline to create more full-time positions. Because we have concluded that the statutes do not require application of the RIF policy to part-time employees, we need not discuss further those assigned errors from Ackerman's brief.

### (b) Inclusion of Forms in Policy

The plaintiffs have all asserted on appeal that the Board and the district court erred in not finding that § 85-1530 requires any evaluation forms utilized in a RIF policy to be attached to the policy. Section 85-1530 provides, in relevant part, that "[i]f employee evaluation is to be included as a criterion to be used for reduction in force, specific criteria, *such as* frequency of evaluation, evaluation forms, and number and length of classroom observations shall be included as part of the reduction-in-force policy." (Emphasis supplied.) The plaintiffs seek to have us impose a literal meaning to this statute, so that the failure of the Board to physically attach copies of the evaluation forms to be used would prove fatal to the RIF policy.

Section 6 of the Board's RIF policy provides as follows:

In the event that a reduction of permanent full-time employees is necessary, the following criteria and formula shall be applied to determine the order of reduction within the Affected Area:

. . . .

E) Specific criteria used to evaluate full-time teaching faculty include evaluation procedures generally in use by the College, including an annual evaluation at or respecting a time established by the College; teaching faculty evaluation forms currently in use by the College as from time to time amended; classroom visitations which shall be held no less frequently than once per year and for a duration of at least forty-five minutes for each visitation; and evaluation conferences between the full-time teaching faculty member and his/her supervisor. Evaluation forms

in use at date of adoption of this policy include supervisory evaluation forms and student evaluation forms.

Section 85-1530 requires that a RIF policy include specific criteria to be used if evaluations are part of the criteria for determining whose employment to terminate during a reduction in force. The statute then provides several examples of what types of specific criteria could be included in the policy to comply with the statute. We conclude that the RIF policy in the present case complied with the requirements of the statute and that the policy in the present case did include specific criteria, such as the frequency of evaluations, the number and length of classroom observations to be considered, and which evaluation forms would be utilized. Although the actual forms were not physically attached to the RIF policy, the policy informs employees as to which forms will be utilized.

As noted above, the RIF policy indicates that evaluation forms will be used in assessing the order of reduction in force. The RIF policy identifies the applicable evaluation forms as being the "teaching faculty evaluation forms currently in use by the College as from time to time amended," as opposed to any type of evaluation forms designed specifically for use in a reduction in force. Additionally, the RIF policy defines the term "evaluation forms" to "include supervisory evaluation forms and student evaluation forms." As such, the RIF policy fairly informs the teachers as to which evaluation forms may be used in achieving a *necessary reduction in force.*

We note that the plaintiffs do not contend that they were unaware of what evaluation forms would actually be used, but, rather, contend that the Board should have physically attached copies of the forms to the RIF policy. In fact, the plaintiffs received copies of the completed evaluation forms for all nine teachers in the OST program prior to the hearing. We do not read the statute as requiring such action by the Board as attaching potentially lengthy evaluation forms to the RIF policy, which would potentially require the Board to adopt an entirely new policy every time the evaluation forms are amended.

The record in the present case indicates that the Board's policy set out with some detail the specific criteria to be used during a reduction in force. Contra *Trolson v. Board of Ed. of Sch.*

*Dist. of Blair,* 229 Neb. 37, 424 N.W.2d 881 (1988) (record failed to indicate that reduction in force factors were utilized in accordance with board's policy). On the record before us, the plaintiffs could not seriously contend, nor do they attempt to, that they were not aware of what evaluation forms would be used. The plaintiffs' allegations in this regard are without merit.

### (c) Ten-Day Period for Hearing

Ackerman alone assigns and argues that the Board violated the 10-day rule set forth in the RIF policy when proceeding to hear the matter on February 20, 1996. The RIF policy provides:

> If the request for hearing is received by the Board at least ten (10) days prior to the next regular Board meeting, then the hearing shall be scheduled to be held at or prior to such meeting, and if not, then at or prior to the next following Board meeting.

There is no dispute that this provision of the RIF policy was not complied with. It appears that Ackerman's request for hearing was received by the Board less than 10 days prior to the February 20 hearing.

The above provision in the RIF policy plainly conflicts with the statutory provision regarding the timing of a reduction in force hearing. Section 85-1528 provides that "[u]pon receipt of such request [for a hearing regarding the proposed termination of an employee's contract], the board shall order the hearing to be held *within* ten days . . . ." (Emphasis supplied.) It is clear from a reading of the statute that its purpose is to require a timely hearing. Based on the language of the RIF policy, it appears that the policy is concerned with administrative convenience in that the proposed termination of a contract be considered during a regularly scheduled board meeting.

The RIF policy provision in this regard cannot be upheld, as it violates the letter and spirit of § 85-1528. If both the RIF policy provision and statute were to remain in effect, an employee would be able to manipulate the timing of a reduction in force hearing by requiring the Board to comply either with the policy or with the statute, whichever best suits the employee's purposes. We note that the RIF policy provides for a mechanism to resolve conflicts between the policy and the applicable statutes.

Although this mechanism was not utilized in the present case, it indicates that in case of a conflict, the statutes are controlling.

We note that Ackerman objected at the hearing on the basis that the Board had not complied with the RIF policy's 10-day rule but did not request a continuance. There is nothing in the record to suggest that Ackerman was not prepared to proceed or that Ackerman was unable to respond to the College's evidence regarding the proposed reduction in force. In fact, the record shows that Ackerman was prepared to challenge the proposed reduction in force by showing that the College had not complied with specific provisions of the RIF policy. Furthermore, it is clear from the record that the Board complied with the statutory requirement that the reduction in force hearing be held within 10 days of the employee's request for the same. For these reasons, we conclude that on these facts this assignment is without merit.

### 3. Board's Compliance With Policy

The plaintiffs all assert that the Board failed to comply with the RIF policy. In particular, the plaintiffs all challenge whether the proper evaluation forms were used to determine the midpoint. In addition, Ackerman challenges whether the College properly scored the faculty members who fell below the midpoint and whether the College sufficiently proved a causal connection between the need for the reduction in force and her circumstances.

### (a) Use of Correct Evaluations

The plaintiffs have all asserted that the College failed to comply with the RIF policy provision that requires the two most recent evaluations be considered for the policy procedures. The plaintiffs argue that the College improperly considered evaluations for the academic years of 1993-94 and 1994-95. They contend that the College should have considered the evaluations for the academic years of 1994-95 and 1995-96.

Regarding the evaluations to be used when determining the midpoint, the RIF policy provides: "In determining [the] midpoint of evaluations, if all staff in the particular Affected Area have been evaluated therein for two (2) years or more, then the

average of the two (2) most recent annual evaluations shall be used."

The record before us shows that the evaluations for the academic years of 1993-94 and 1994-95 were the most current completed evaluations. Wild, the division chair, testified that the two most current evaluations in her file were for the academic years of 1993-94 and 1994-95. Jan Pieper, the director of human resources, testified without contradiction that at the time the reduction in force procedures were applied to the OST faculty, the 1995-96 evaluation process was still in progress and had not yet been completed.

We conclude that the College did not err in utilizing the evaluations for the academic years of 1993-94 and 1994-95 in determining the midpoint of evaluations for reduction in force purposes. We note that Ackerman specifically assigned an error regarding the evaluation forms used for the 1995-96 academic year. As the College did not use, nor did it err in failing to use, the 1995-96 evaluations in making the reduction in force determination, we need not address further Ackerman's assigned error in this regard.

### (b) Scoring of Faculty Members Below Midpoint

Ackerman alone makes a claim that the College did not follow its RIF policy in crediting points to the four faculty members whose evaluations fell below the midpoint. Ackerman argues that she should have received four points, rather than the three points given by the College, in the "diversity" category. She argues that she could have taught a computer class called MCT 103 (which is in another discipline) and that she had previously taught a bookkeeping class at the College in 1976. The record shows that if Ackerman would have received four points in this category, her total score would have been the same as Flaming's score. Flaming was the faculty member below the midpoint who was not discharged.

The Nebraska Supreme Court has stated that a school board has "broad discretion in determining what factors to include in its reduction in force policy as well as how to weight those factors." *Nickel v. Saline Cty. Sch. Dist. No. 163*, 251 Neb. 762, 771, 559 N.W.2d 480, 486 (1997).

According to the RIF policy, faculty members below the mid-point of evaluations are given a score based on the following categories: level of placement, diversity, and length of full-time service. The RIF policy provides that the diversity points should be given based on the "*ability* of staff members to teach" courses both within their discipline and outside their discipline. (Emphasis supplied.) In the diversity category, up to three points are awarded based on the percentage of course work the teacher can teach within his or her discipline and a fourth point is awarded if the teacher is able to teach 100 percent of the course work *within* his or her discipline and, in addition, courses *outside* his or her discipline.

The record shows that Wild was responsible for scoring the plaintiffs and the fourth faculty member who was below the midpoint in the applicable categories. Wild testified that she gave each of the four faculty members three points for diversity, "in a sense of fairness," indicating that each was given credit for being able to teach 100 percent of the course work within her discipline, and that she gave Flaming the fourth point because Flaming had actually been teaching the MCT 103 course. Wild testified that she awarded the fourth point based on whether the particular teacher had "demonstrated" an ability to teach courses outside her discipline.

We conclude that awarding the fourth diversity point based on whether a teacher has demonstrated an ability to teach courses outside his or her discipline is a reasonable method for the evenhanded application of this point. We further conclude that the College did not abuse its discretion by failing to give Ackerman the fourth diversity point. Ackerman acknowledged that she had never taught the MCT 103 course. Her opinion that she could teach the course was, according to her testimony, based on the fact that she had taken the course. Regarding the bookkeeping course Ackerman had previously taught more than 20 years ago, there was no testimony that the bookkeeping course presently includes the same curriculum as it did in 1976 or that Ackerman continued her education in this area so that she would still be competent to teach the course.

The College awarded the diversity points in an evenhanded manner based on present demonstrated teaching ability. See

*Nickel, supra* (providing that evenhanded consideration of affected teachers' present involvement was reasonable). We conclude that this assigned error is without merit.

### (c) Connection to Change of Circumstances

Ackerman alone also contends that the College erroneously applied the RIF policy to her because there was no causal connection between the reason for the reduction in force and her particular circumstances. Ackerman argues that since the reason for the reduction in force in the OST program was a declining student enrollment, the fact that she had a full course load should have exempted her from the reduction in force.

In this regard, the policy provides: "If such reduction in force is to affect only a specific Affected Area, any such circumstances must specifically relate to the staff members to be reduced." According to the record before us, the circumstances surrounding the need for a reduction in force of OST full-time faculty included a declining student enrollment in the OST program. The evidence showed that the OST teachers' employment contracts provided that each was to carry 18 credit hours per quarter. As a result, the College *assigned* each teacher 18 hours each quarter. Therefore, the fact that Ackerman had a "full" course load does not mean that the present circumstances did not specifically relate to her. In addition, it is apparent that the decline in enrollment specifically affected the OST department, meaning that it specifically related to those faculty teaching in the department. We conclude that there was sufficient evidence there was a causal connection between the reduction in force and Ackerman's circumstances and that this assigned error is without merit.

### 4. DUE PROCESS

The plaintiffs all assert that the hearing before the Board did not comport with due process requirements. The plaintiffs assert that procedural due process was not afforded to them during the hearing and that the Board erroneously admitted an exhibit into evidence which, as noted below, is an issue which we review in teacher termination hearings in the context of due process.

## (a) Due Process Generally

Among the plaintiffs' due process arguments, the plaintiffs assert that the court failed to find that the Board erred by placing on the plaintiffs the burden of proving comparability of observations of other teachers, including OST teachers. We are unable to discern exactly what due process violation the plaintiffs believe occurred in this case, although it appears that they are asserting that the Board somehow impermissibly shifted the burden of proof to them during the hearing by allowing a compilation exhibit, exhibit 11, which will be discussed in more detail below, into evidence without requiring the College to also offer into evidence the underlying teacher evaluations, which results are compiled on exhibit 11.

As a prerequisite to terminating the employment of an employee with a property right in continued employment, the employer must provide notice and an opportunity for a hearing appropriate to the nature of the case. *Unland v. City of Lincoln*, 247 Neb. 837, 530 N.W.2d 624 (1995). Before termination of employment, an employee with a property right in continued employment must be given oral or written notice of the basis for the termination, an explanation of the employer's evidence, and an opportunity to present his or her side of the story. *Id.* See, also, *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985). All process that is due such an employee is provided by a pretermination hearing at which the employee has an opportunity to respond, coupled with posttermination procedures for review. *Id.*; *Unland, supra*.

In the present case, the plaintiffs do not specifically challenge any of these principles. No dispute concerning the notice provided is present in the record below or in the briefs on appeal. It appears as if the plaintiffs are somehow alleging that they were not afforded an adequate opportunity to present their side of the story because of some improper shifting of the burden of proof.

Our review of the record indicates that the Board hearing officer, at the outset of the hearing, indicated that the burden of proof would be on the College throughout the proceedings. A review of the proceedings indicates that such remained the case

throughout the hearing, and the burden was never shifted to the employees. Although there may have been evidence which would have been favorable to these employees in arguing that their employment was being improperly selected for termination, requiring them to produce such evidence does not effect an improper shifting of the burden of proof. Rather, it reflects the reality that once the College succeeded in demonstrating that there was a reasonable need for a reduction in force, that the RIF policy was followed, and that the policy reasonably resulted in these plaintiffs' employment being selected for termination, then the College had satisfied its burden of proof. The plaintiffs were then allowed to present any evidence on their own behalf.

The plaintiffs received sufficient notice, and they were afforded a hearing. At the hearing, the plaintiffs had the opportunity to question witnesses, to challenge the testimony and evidence presented by those witnesses, to call witnesses on their own behalf, to present evidence on their own behalf, and to argue their case to the Board. The record before us does not support an allegation that the plaintiffs' due process rights were infringed, and their assertions in this regard are without merit.

### (b) Admission of Exhibit 11

On appeal, the plaintiffs all contend that the Board erroneously received exhibit 11 without adequate foundation. Exhibit 11 is a summary of the process by which the College determined which three OST faculty members were to be the subjects in the reduction in force. It contains a compilation of the results of the evaluations used to rank the OST faculty members and a ranking of the four faculty members who fell below the midpoint based on their scores in the categories of level of placement, diversity, and length of full-time service. We note that the underlying evaluations were not offered by either the plaintiffs or the College or admitted into evidence.

■ Within the context of the review of a school board hearing regarding the termination of employment of a teacher for just cause, the Nebraska Supreme Court stated: "Although strict adherence to the rules of evidence cannot be demanded or even expected at a hearing before a school board . . . the basic prin-

ciples of due process demand that hearsay statements of students be given little, if any, weight." *Hollingsworth v. Board of Education*, 208 Neb. 350, 360, 303 N.W.2d 506, 512 (1981). Therefore, it appears that due process principles rather than the rules of evidence apply at hearings such as the one on review here. As discussed above, due process at such hearings requires that the teacher be provided with an opportunity to present his or her side of the story. See, *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985); *Unland v. City of Lincoln*, 247 Neb. 837, 530 N.W.2d 624 (1995).

In the case before us, the plaintiffs' objections at the hearing concerned "foundation" for the exhibit. The plaintiffs apparently contended below that foundation was lacking regarding the data compiled from the evaluations. However, the record before us shows that Wild testified regarding the manner in which the evaluations were completed. Furthermore, the record shows that the plaintiffs were provided copies of the evaluations prior to the hearing and had an opportunity at the hearing to challenge the accuracy of the data on the exhibit or offer any evidence they wished to concerning the evaluations. In fact, the plaintiffs successfully demonstrated the inaccuracy of one figure on the exhibit during the hearing. Because the plaintiffs were provided adequate notice, discovery, and an opportunity to challenge the exhibit, we conclude that there was adequate foundation for the admission of this exhibit to comport with due process. See *Hollingsworth, supra*. See, generally, Neb. Rev. Stat. § 27-1006 (Reissue 1995) (providing that summaries may be used to present contents of voluminous documents which cannot be conveniently examined in court so long as underlying documents are made available to other parties).

## V. CONCLUSION

The record in the present case indicates that the Board acted within its jurisdiction and that there was sufficient competent evidence as a matter of law to support the Board's decision. Finding no merit to any of the plaintiffs' assignments of error, we affirm.

AFFIRMED.